JASON S. TAKENOUCHI (CBN 234835)
ANDREW R.J. MUIR (CBN 284817)
KASOWITZ BENSON TORRES LLP
101 California Street, Suite 3000
San Francisco, California 94111
Telephone: (415) 421-6140
Facsimile: (415) 398-5030
*JTakenouchi@kasowitz.com*
*AMuir@kasowitz.com*

JACK SHAW (CBN 309382)
KASOWITZ BENSON TORRES LLP
333 Twin Dolphin Drive Suite 200
Redwood Shores, CA 94065
Telephone: (650) 453-5170
Facsimile: (650) 453-5171
*JShaw@kasowitz.com*

Attorneys for Plaintiff
Crazy Maple Studio, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAZY MAPLE STUDIO, INC., | Case No. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **1. BREACH OF CONTRACT;** |
| MARIE FORCE and HTJB, INC., | **2. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS;** |
| Defendants. | **3. TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
| | **4. LIBEL** |
| | **JURY TRIAL DEMANDED** |

Plaintiff Crazy Maple Studio, Inc. ("CMS"), for its complaint against defendants Marie Force and HTJB, Inc. (collectively "Defendants"), alleges as follows:

**PRELIMINARY STATEMENT**

1. This action arises out of Defendants' repeated misstatements of fact and character attacks concerning CMS, all made with the intent to punish CMS for not conceding to Defendants' contract demands.

2. Defendant Marie Force ("Force") and her wholly owned company HTJB Inc. signed a contract with CMS in March 2021. Under the terms of the contract, Defendants granted CMS a non-exclusive license to market and sell online content based on Force's novels to users of CMS's innovative interactive platforms. In exchange, CMS agreed to handle all aspects of the marketing, sale and support of interactive stories that drew upon Force's work. This included payments of the platform fees charged to third party hosts such as Apple and Google and relevant taxes, which generally amount to 30 to 33 percent of the total revenues generated. These platform fees and taxes are deducted by third party hosts from gross revenues, *before* paying net sale proceeds to CMS, so CMS never even possesses–much less retains–platform fees.[1]

3. Force was initially pleased with her books' performance on CMS's application, leading her to ask CMS about entering into an additional contract to distribute more of her books on CMS's applications. In August 2021, however, Force became unhappy with the share of profits that she received. Although she admitted that the fee structure had been accurately disclosed in the contract, Force demanded that CMS terminate the contract on her terms. When CMS refused, Force began a campaign of mistruths that she believed would force CMS to accede to her demands. Among other things, Force told thousands of other authors on online forums that CMS, not Apple and Google, was pocketing the platform fees, and that as a result CMS was taking a massive cut of 60 percent or more of the revenues generated by authors' content. This was patently untrue, and Force knew it was untrue.

---

[1] CMS discloses gross revenues and the platform fee deduction in the royalty statements it provides to authors, which reflects CMS's commitment to transparency and empowering the author community.

4. Force's libelous statements resulted in an immediate disruption of CMS's existing contracts and interfered with its ability to recruit prospective authors to publish on CMS's mobile applications. Indeed, based on Force's libelous statements, authors have declined to execute negotiated contracts, withdrawn from negotiations altogether, or simply never responded to CMS's offers. In addition to interfering with CMS's contracts and future economic advantage, Force's statements also caused irreparable harm to CMS's reputation. CMS estimates its losses are in the millions of dollars.

## THE PARTIES

5. Plaintiff CMS is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Sunnyvale, California. CMS is a publisher that brings fictional literature to life by blending prose with animation, music, sound effects, and a unique style of gameplay. In essence, CMS obtains a license to authors' work and adapts them to the style of its serialized applications. CMS then distributes these original, interactive, and immersive adaptations through its mobile applications, which specifically target an entirely different demographic of consumers than traditional print and eBook publishing.

6. Defendant Force is a widely published romance author. Force has been self-publishing novels in paperback and electronic book ("eBook") formats since at least 2012 through her alter-ego corporation HTJB, Inc., ("HTJB"), for which she serves as the President, Treasurer, and Secretary.

7. In February 2021, Force reached out to CMS seeking to publish her novels on their platform. She subsequently licensed ten of her novels to CMS for distribution as eBooks pursuant to a non-exclusive licensing agreement ("the Distribution Agreement").

8. Plaintiff is informed and believes, and on that basis alleges, that Force has a principal place of residence in Portsmouth, Rhode Island.

9. Defendant HTJB is a domestic profit corporation duly organized and existing under the laws of the State of Rhode Island, with its principal place of business in Portsmouth, Rhode Island. Force promotes HTJB on her professional author website. HTJB's registered purpose is to serve as an author of print and e-books and provide formatting services for authors.

<mark>Case 3:21-cv-08095 Document 1 Filed 10/15/21 Page 4 of 18</mark>

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 inasmuch as it is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper in this District because Defendants contractually agreed to litigate any dispute arising from the Distribution Agreement in federal court in San Francisco.

12. This Court has personal jurisdiction based on Defendants' consent and because the claims arise from Defendants' contacts with California.

## STATEMENT OF FACTS

### A. Crazy Maple Studio and its KISS Mobile Application.

13. Born in the heart of Silicon Valley in 2017, plaintiff CMS is a publisher that contracts with authors to distribute their works through its mobile applications. CMS presents an entirely unique approach to storytelling that brings fictional stories to life by blending animation, music, sound effects, and a unique style of gameplay with prose, which offers players and readers an immersive interactive experience unlike any other in the publishing industry.

14. CMS has devoted significant time and resources to developing its mobile applications. CMS has created two "choose your own adventure" apps called "Chapters: Interactive Stories" and "Spotlight," as well as genre-specific apps like "Scream" – devoted to thrillers and suspense stories – and "KISS" – which is dedicated to romance novels.

15. With captivating storylines, KISS delivers a consistently compelling player experience and, through its unique presentation, introduces authors to new customers that, by and large, do not purchase romance novels in print or eBook. Once they download the KISS application, users can then read and purchase an author's work. Distributing fiction writing via interactive mobile applications like KISS is an emerging model in the publishing industry, and there are unique challenges and costs. For example, CMS's licenses are non-exclusive, limiting CMS's distribution – and resulting revenue – to sales via its mobile applications. In addition, mobile application stores such as Apple's App Store and Google Play, including taxes, charge application creators like CMS roughly 30-33% of the gross revenues generated by a mobile

application sold through their stores. Finally, CMS must continually invest in marketing KISS through new forms of media in order to attract users to the KISS application because the mobile technology market involves a very high rate of user attrition, necessitating a constant need to invest in user acquisition to maintain and grow the number of daily active users of the application, and the target demographic is comprised of customers who are more casual and inconsistent readers, generally speaking, who do not purchase print or eBooks through traditional and independent publishers.

**B.     The Distribution Agreement.**

16.     Defendant Force sought out a publishing opportunity with CMS and, on February 24, 2021, she contacted CMS through its author submission form and submitted a sample of her work for CMS's consideration.

17.     KISS's Managing Editor responded the next day, February 25, 2021, telling Force that CMS would like to publish her novels on KISS. After discussions with CMS's editor, Force selected the titles that she wanted to distribute on KISS. On March 3, 2021, KISS's Managing Editor offered to draft a contract for CMS to publish the titles Force had selected. Force responded that she would consider the contract if CMS agreed to publish five additional titles.

18.     CMS agreed to publish Force's additional books, and on March 5, 2021, KISS's editor e-mailed the Distribution Agreement to Force and encouraged her to ask any questions she had. CMS answered each of Force's questions and, on March 8, 2021, Force executed the Distribution Agreement, with CMS on behalf of HTJB.

19.     The Distribution Agreement granted CMS a non-exclusive license to distribute ten of Force's novels as eBooks (the "Works") on KISS. The Distribution Agreement expired two years after publication on KISS. Among other provisions, the Distribution Agreement contains a confidentiality provision expressly prohibiting Force from disclosing the terms of the contract, including the fee and compensation structure. The contract also listed the limited circumstances justifying premature termination and explained the compensation structure.

20.     Force told CMS that she was pleased with her books' performance on the KISS application after receiving her first royalty statement, which clearly laid out the gross revenue and

Kasowitz Benson
Torres LLP
Attorneys at Law
San Francisco

- 5 -
COMPLAINT

the fees deducted.  Indeed, on July 26, 2021, Force contacted CMS about releasing more of her novels as eBooks on the KISS platform because the others "seem[ed] to be doing pretty well." The parties negotiated, and CMS provided Force with a non-exclusive licensing agreement covering the additional works, the terms of which were identical to the existing Distribution Agreement.  On August 18, 2021, though, Force informed CMS that she would not accept the fee and compensation structure, and she rejected the second contract related to her additional works.

21.   On August 25, 2021, Force emailed KISS's Managing Editor, demanding that CMS terminate the Distribution Agreement early because she was dissatisfied with the amount of fees deducted from gross revenues.  KISS's Managing Editor responded by explaining the fee and compensation provisions and how Force's royalties were paid appropriately according to the contract.  The Managing Editor also connected Force with CMS's Contracts Manager, who explained to Force, once again, the user acquisition process and author compensation structure. He also explained to Force that there was no contractual basis to terminate the contract prematurely and offered a compromise:  that CMS would not renew its license after the two-year term expired.

C.   **Force's Threats, Bullying and Retaliatory Disclosure of Confidential Information.**

22.   Although Force was paid according to the Distribution Agreement and despite CMS's repeated explanations of the contract's terms, Force emailed CMS's Project Manager on August 27, 2021, continuing to complain about the compensation structure that she had expressly agreed to when she executed the Distribution Agreement.  This time, though, she threatened to encourage other authors not to publish with CMS if CMS did not release her from the Distribution Agreement immediately.  Force's own words leave no doubt that she intended to retaliate against CMS by disparaging CMS and interfering with its business prospects: "Since you're not willing to honor my request to immediately terminate my contract, I'll be sure to share my experience with your company with the many authors who come to me asking how my experience has been…A lot of people will be interested in that information."

23.   CMS stood by the terms of the parties' contract and declined Force's unjustified, unilateral demand to terminate the Distribution Agreement, which apparently infuriated Force.

Kasowitz Benson Torres LLP
Attorneys at Law
San Francisco

Lacking a contractual basis to terminate the contract, Force once again resorted to bullying and threatening CMS employees. On August 30, 2021, she emailed the KISS Managing Editor again to complain and criticize CMS, even though the employee had no authority to terminate the Distribution Agreement and despite the fact that this employee had already escalated Force's complaints to the Project Manager once before for exactly that reason. Force specifically warned that if CMS did not reconsider its decision not to release her from the Distribution Agreement, she would, "definitely go public with this experience" and attempt to dissuade other authors from partnering with CMS because she would "not stay silent about this. . . ."

24. Force's threats clearly reflect her malicious intent to disparage CMS and tarnish its reputation in order to frustrate its recruitment and retention of other authors.[2] Notwithstanding the fact that Force approached CMS to put her books on the KISS platform and despite CMS's answers to all of her questions and its repeated explanations about the terms of the contract and the distribution model more generally, Force inexplicably demanded that CMS "let [her] go with no further discussion" because she was "not happy with this arrangement."

25. CMS declined Force's demand that it terminate the Distribution Agreement because it performed its obligations under the contract and there was no legitimate basis to terminate it prematurely.

D.  **Force's Grievance Campaign and Online Disparagement.**

26. On September 13, 2021, at 2:15 PM, Force fulfilled her threat and posted the confidential terms of the Distribution Agreement to the "Author Support Network" group on Facebook. Force is the creator and an administrator of the "Author Support Network" group, which is comprised of 8,800 members, primarily independent authors, who are CMS's typical partners. The "Author Support Network" group had been dormant and defunct on Facebook since April 2019, but Force "unarchiv[ed]" it solely to criticize CMS. In breach of the Distribution Agreement's confidentiality provision, Force disclosed the amount of royalties she received and

---

[2] Force was well acquainted with the damage that could be done through social media. In late 2019 Force hired an editor, Sue Grimshaw, who had previously "liked" tweets from former president Donald Trump relating to immigration arrests and other matters. When Grimshaw's old tweets were shared on social media, Force terminated the editor and deleted the Facebook page for her publishing company.

the percentage of revenues charged against gross revenues for the preceding quarter. She also falsely implied that CMS retained the "platform fee" of 32% of gross revenues from the distribution of her books when, in fact, that fee is charged by the mobile application stores – such as Apple's App Store and Google Play – and is paid over by CMS from revenues.

27. Force knew that her disclosures violated the Distribution Agreement and admitted as much in one of her posts to the "Author Support Network" group page. In response to another author's inquiry whether she could share Force's confidential information with her agent, Force responded without remorse, "[y]es just protect the source so I don't get sued. Lol." Even more, Force encouraged the propagation of her false narrative by liking comments from authors who agreed to shield her with anonymity while spreading her falsehoods, compounding the harm suffered by CMS.

28. In the dozens of comments that she left in the discussion that followed her initial post on September 13, Force repeated her false assertion that CMS kept $22,000 out of $27,453 – or over 80% – of gross revenues from distribution of the Works. Force warned the other authors that CMS would take a similar percentage from them, leaving the author to net only 19% of the revenue. She also repeated her false claim that CMS retained 32% of revenues as a platform fee. For example:

    a. On September 13, 2021 at 2:55 PM, Force wrote, "I don't need that five grand while they're keeping 22. Fuck that shit."

    b. On September 13, 2021 at 7:00 PM, Force wrote, "[t]here's no way they deserve $22,000 while I get 5."

    c. On September 13, 2021 at 7:52 PM, Force wrote, "I want a fair cut of the royalties (rather than me paying them to be on their platform, which is not how this should work) and I want them to let me go after I objected to their terms, which makes the contract void. Simple enough."

    d. On September 13, 2021 at 7:59 PM, in response to another author's post that "I refuse to leave 81% on the table – especially when I rode them about it and they assured me there would be balance," Force stated, "I

- 8 -
COMPLAINT

wouldn't push to be launched.  Ride it out and keep the advance.  Otherwise you're gonna be pissed like I am about why they get 22 and I get 5."

e. On September 13, 2021 at 8:00 PM, Force wrote, "Why do they get 22k and I get 5?"

f. On September 14, 2021 at 5:03 PM, Force wrote, "30 percent of platform fees are fine.  If that's ALL they're taking, but they're taking way more than that."

g. On September 14, 2021 at 5:48 PM, Force wrote, "Just say nothing to them while I give them 4/5ths of the revenue they're making in my books for the next 18 months."

29. Despite her false claims that CMS had treated her unfairly, Force admitted her ignorance as to how the mobile distribution marketplace works and how the Distribution Agreement allocated costs, which further underscores her utter disregard for the truth when she made assertions on Facebook about the contract's fee and compensation provisions.  For example:

a. On September 13, 2021 at 2:40 PM, Force conceded that she did not perform due diligence to ensure she understood the fee and compensation structure:  "my bad for not vetting [the Distribution Agreement] better"

b. On September 13, 2021 at 2:35 PM, Force wrote, "I'll admit to not digging as deep as I should have."

30. Undeterred by the fact that she had made no effort whatsoever to understand the financial realities at play with mobile distribution, Force nevertheless took to Facebook to spread her false accusations about CMS's business practices.  In the dozens of comments she made in the discussion that followed her initial post, Force repeatedly encouraged prospective authors not to contract with CMS and encouraged CMS's current authors to approach CMS about terminating their existing contracts.  Many other authors took note.  For example:

a. On September 13, 2021, Force posted to the "Author Support Network" group page: "Big or small, no one should agree to these terms."

b. Another author, Carly Phillips, asked Force, "Is this secret or shareable with my agent as this is why I'm not signing. I haven't looked at the contract she sent me yet bc I haven't had time." Force responded, "DON'T DO IT. The contract is very deceptive. Doesn't say ANYTHING about all the bullshit fees anywhere in there." When Phillips replied, "[n]o I'm not going to do it. I want to tell my agent why if possible. Because she'll ask. But if not, that is fine too. I still won't sign," Force encouraged the author to send her agent the confidential information that Force had published: "you can show her my info."

c. Yet another author, Emma Scott, posted to confirm that she would follow Force's advice: "They literally just sent me an offer. Thank you for this so I know to hit delete."

31. Although Force proclaims herself to be a champion of the interests of the independent author community, when authors pointed out that Force failed to inform herself of the terms of the contract and that she was "slander[ing] the company with wild subjective accusations" and "fear mongering," Force bullied and attacked the authors for disagreeing with her. She doubled-down on her falsehoods by (falsely) asserting that she was "sharing FACTS," and even told anyone who disagreed with her to simply leave the group. These facts reflect Force's complete disregard for the truth and intent to harm CMS.

32. The destructive impact of Force's post continued for days, and the posts from other authors reflect the degree to which Force's false and deceptive comments negatively impacted CMS's reputation and interfered with its business prospects:

a. On September 14, 2021, another author, Marty Mayberry, vowed not to work with CMS based on Force's misinformation: "Thank you so much for sharing your experience…They approached me six months or so ago

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 10 -
COMPLAINT

about picking up one of my series…but I'll no longer consider working with them."

    b.    On September 15, 2021, a different author, Jennifer Grey, posted, "I was just about to sign a contract with them. Thank you for sharing your experience." To which Force responded, "OMG, RUN."

    c.    On September 13, 2021, another author adopted and spread Force's false narrative about CMS's business practices, writing "There's no telling how many people you just saved from these crooks."

33. That sampling of comments makes clear that Force's misinformation and disparagement to other authors resulted in immediate irreparable harm to CMS's reputation and standing in the publishing community. In fact, some authors reached out almost immediately to withdraw from contract negotiations prior to executing an agreement.

34. Force's libelous statements to the "Author Support Network" Facebook group had the exact effect she intended. Authors began adopting and spreading Force's false, uninformed, and self-serving interpretation of the standard CMS distribution agreement. Significant numbers of authors, agents, and other publishers approached CMS to demand that it terminate other contracts. Force succeeded in immediately and irreparably harming CMS by tarnishing its reputation and destroying its goodwill with authors and their agents.

35. For example, on September 7, 2021, a CMS editor contacted a prospective author to see if she had any questions about KISS or the proposed contract to release the author's works on KISS, which CMS had sent to the author previously after negotiating the titles to be distributed. But on September 13 at 5:45 p.m., the author responded to Force's posts on Facebook stating, "[o]h man what a racket. I'm so sorry. I've been going back and forth with them via email the past few weeks and I will closing down that conversation stat. Thank you for sharing." At 7:00 p.m. that same day, that author informed CMS that she would not proceed with publishing on KISS.

36. Indeed, CMS began receiving more and more inquiries from agents, authors, and publishers who cited Force's misinformation as cause for concern and asked CMS to explain the

false narrative Force had created out of her own ignorance and malice. Major literary agencies and publishers unfairly questioned CMS's business practices and integrity based solely on Force's false statements. For example, on September 13, 2021, the same day Force posted her initial statement, a prominent publisher contacted CMS questioning the integrity of CMS's business practices, and seeking reassurance. The CEO of another major publisher made numerous phone calls to CMS in which she directly referenced Force's statements.

37. Authors reached out to CMS directly as well. On September 14, 2021, just one day after Force posted her false and disparaging comments, another author with whom CMS had prior discussions about releasing her work on KISS backed out, parroting Force's unfounded criticism that CMS is not transparent about its fee and compensation structure. The prospective author told a CMS Acquisitions and Developmental Editor that "you do not have a reputation for transparency when it comes to royalties. You also seem to have a reputation for random hidden fees…Thank you anyway but I am not interested." On September 22, 2021, while Force's post remained up, another KISS author reached out to CMS's Project Manager, inquiring as to "who [she needed] to contact about terminating [her] contract with KISS."

38. Force's unlawful and libelous statements and breach of contract have caused CMS to suffer irreparable harm to its reputation and economic prospects. Indeed, authors are now challenging the fee structure in the CMS contract, which is relatively standard in the industry for mobile apps, based solely on Force's false interpretation and despite her admission that she never bothered to truly understand the terms of the agreement.

39. Force irreparably damaged CMS's relationships with prospective authors, preventing CMS from recruiting them to publish their work on KISS. Force's posts directly interfered with CMS's contract negotiations and continue to threaten CMS's ability to partner with new authors. CMS has already suffered damages in an amount over two million dollars as the result of the lost relationships with its business partners, and CMS continues to suffer lost opportunities to license new works from authors that were exposed to Force's misinformation.

40. Unfortunately, Force's misinformation also harms the author community in general. For example, KISS and CMS's other applications provide authors an introduction to a

new audience of casual, unconventional readers that traditional publishing models do not. As a result, many authors also experience increased sales through traditional channels due to the increased exposure. Simply put, although Force's grievance crusade may have stroked her own ego, it has not benefited the community of authors in the slightest, and it has irreparably harmed CMS.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against Marie Force and HTJB)

41. CMS realleges and incorporates by reference Paragraphs 1-40 of this Complaint, as if fully alleged herein.

42. As described herein, Force under the alter-ego of HTJB, Inc., entered into the Distribution Agreement with CMS which contained a confidentiality provision prohibiting the disclosure by either party of confidential information, including the fee and compensation terms of the Agreement, to any unauthorized party.

43. Force voluntarily and intentionally assented to the Distribution Agreement and was aware of its terms when she entered into it.

44. On September 13, 2021, Force posted details of the terms of the Distribution Agreement regarding compensation structure to the "Author Support Network" group on Facebook, which, on information and belief, has nearly 9,000 members, comprised primarily of professional authors and agents. Nobody in the group, other than Force herself, was authorized to receive the information that Force disclosed.

45. Force's disclosures clearly violated the confidentiality provision in the Distribution Agreement and, therefore, constitute a breach of contract.

46. Force's disclosures and Defendants' unlawful breach of contract directly and proximately harmed CMS's reputation and caused damages in the form of lost revenues.

47. By reason of the foregoing, CMS has incurred and will continue to incur actual damages due to Defendant's willful disregard of CMS's rights, and CMS is entitled to recover from Defendants these actual damages in an amount to be determined at trial pursuant to Cal. Civ. Code § 3333.

## SECOND CAUSE OF ACTION

**(Intentional Interference with Contractual Relations Against Marie Force)**

48. CMS realleges and incorporates by reference Paragraphs 1-47 of this Complaint, as if fully alleged herein.

49. As described herein, Force, acting through her alter-ego HTJB, intentionally and voluntarily entered into the Distribution Agreement with CMS which is a binding, valid, and enforceable contract.

50. Per the terms of its contracts, CMS does not keep upwards of 80% of the revenue generated from the distribution of the works it acquires, nor does it receive any of the platform fees that are, in fact, paid to the application stores. Force's statements that CMS kept over 80% of the gross revenue from the distribution of the Works and retained the platform fees for itself are false.

51. Force's false statements on social media regarding the proportion of the gross revenue from the distribution of works retained by CMS prompted authors and their agents to approach CMS about terminating their licensing agreements, disrupting existing contractual relations.

52. CMS is informed and believes, and on that basis alleges, that Force was aware of the existence of these contracts and by inducing authors and their agents to approach CMS about terminating their contracts, has, with willful and reckless disregard to CMS's rights, intentionally interfered, and continues to interfere, with the valid and enforceable contracts between CMS and other authors.

53. CMS has suffered irreparable harm and has been damaged as a direct and proximate result of Force's tortious conduct.

54. By reason of the foregoing, CMS has incurred and will continue to incur actual damages due to Defendant's willful disregard of Plaintiff's rights, and CMS is entitled to recover from Force these actual damages in an amount to be determined at trial pursuant to Cal. Civ. Code § 3333.

## THIRD CAUSE OF ACTION

**(Intentional Interference with Prospective Economic Relations Against Marie Force)**

55. CMS realleges and incorporates by reference Paragraphs 1-54 of this Complaint, as if fully alleged herein.

56. As described herein, CMS seeks to acquire intellectual property rights by entering into non-exclusive distribution agreements with authors.

57. Per the terms of its contracts, CMS does not keep upwards of 80% of the revenue generated from the distribution of the works it acquires, nor does it receive any of the platform fees. Force's statements to the effect that CMS kept over 80% of the gross revenue from the distribution of her works and retained the platform fees for itself in addition to withholding marketing expenses from the royalty calculation are and were false.

58. Force's false statements on social media regarding the proportion of the gross revenue from the distribution of works retained by CMS prompted authors who had received offers from CMS or were in the negotiation process to halt discussions and walk away from the deals, disrupting CMS's valuable prospective economic relationships.

59. CMS is informed and believes, and on that basis alleges, that Defendant was aware of the existence of these economic relationships between CMS, authors, and prospective authors and the future economic benefit to CMS arising therefrom. And, by inducing authors and their agents to approach CMS about terminating their contracts, has, with willful and reckless disregard to Plaintiff's rights, intentionally interfered, and continues to interfere, with the valid and enforceable contracts between CMS and its authors.

60. CMS is informed and believes, and on that basis alleges, that Defendant intentionally pursued this course of conduct in a willful effort to disrupt CMS's economic prospects. As a result of Defendant's tortious conduct, authors are avoiding and withdrawing their works from CMS's platforms, and CMS can no longer enjoy the prospective benefits that its existing and prospective economic relationships with authors would have brought.

61. CMS has suffered irreparable harm and has been damaged as a direct and proximate result of Defendant's tortious conduct.

62. By reason of the foregoing, CMS has incurred and will continue to incur actual damages due to Defendant's willful disregard of CMS's rights, and CMS is entitled to recover from Defendant these actual damages in an amount to be determined at trial pursuant to Cal. Civ. Code § 3333.

## FOURTH CAUSE OF ACTION

### (Libel Against Marie Force)

63. CMS realleges and incorporates by reference Paragraphs 1-62 of this Complaint, as if fully alleged herein.

64. As described herein, Force, under the alter-ego of HTJB, entered into the Distribution Agreement with CMS which contained a confidentiality provision prohibiting the disclosure by either party of confidential information, including the terms of the Agreement, to any unauthorized party.

65. Per the terms of its contracts, CMS does not keep upwards of 80% of the revenue generated from the distribution of the works it acquires, nor does it receive any of the platform fees. Force's statements to the effect that CMS kept over 80% of the gross revenue from the distribution of her works and retained the platform fees for itself in addition to withholding marketing expenses from the royalty calculation are and were false.

66. On September 13, 2021, Force, without privilege or authorization to do so, published inaccurate and false written statements concerning the terms of the Distribution Agreement relating to the agreement's cost structure to the "Author Support Network" group on Facebook.

67. Upon the publication of these false statements, authors began to adopt Force's false statements and impressions of CMS and began to describe CMS as "shady" while Force encouraged every author in the group not to do business with CMS. Force's false and disparaging statements irreparably harmed CMS's reputation.

68. Force's conduct is a clear violation of the Cal. Civ. Code § 45.

69. CMS has been damaged and suffered irreparable harm as a direct and proximate result of Force's false and misleading statements about its business practices.

70. By reason of the foregoing, CMS has incurred and will continue to incur actual damages as a direct and proximate result of Force's willful disregard of CMS's rights, and CMS is entitled to recover from Defendant these actual damages in an amount to be determined at trial pursuant to Cal. Civ. Code § 3333.

## **DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues of triable of right by a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants and that this Court enter an order:

1. Permanently enjoining and restraining the Defendants from:
   a. In any way disclosing, disseminating, revealing or continuing to disclose, disseminate or reveal any information deemed "confidential" pursuant to the contract between CMS and Defendants.
   b. Publishing false and defamatory statements about CMS or its contractual arrangements with Defendants or any other author, including, but not limited to, posts on Facebook or any other social media platform.
2. Ordering Defendants:
   a. To delete the September 13, 2021 post to the "Author Support Network" group on Facebook re "Author Beware--Crazy Maple Studio/KISS app" as well as any subsequent posts on Facebook or any other social media platform that refer to, discuss, or disclose any term or provision of any contract between CMS and any Defendant.
   b. To delete all posts by Defendant Marie Force on Facebook or any other social media platform that refer to, discuss, or disclose any term or provision of any contract between CMS and any Defendant.
3. Awarding damages in an amount no less than two million dollars according to proof at trial.
4. Awarding interest, costs, and attorneys' fees.

1     5.    Awarding such other and further relief as this Court deems just and proper.

Dated: October 15, 2021　　　　　　　　　KASOWITZ BENSON TORRES LLP

By: */s/ Jason S. Takenouchi*
     Jason S. Takenouchi

Attorneys for Plaintiff
Crazy Maple Studio, Inc.